IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JULIE A. DOWNEY AND JAMES D.
DOWNEY,

       Plaintiffs,

   vs.                              No. 1:11-CV-00587-MCA-KBM

AMERICAN NATIONAL PROPERTY
AND CASUALTY COMPANY,
AMERICAN NATIONAL GENERAL
INSURANCE COMPANY, and
DENNIS ROSSI,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on a *Motion to Dismiss Plaintiffs' Claims Against Defendants American National Property and Casualty Company and American National General Insurance Company* [Doc. 12], *Motion to Dismiss Claims Against Defendant Dennis Rossi* [Doc. 13], *Motion to Stay Briefing on Motions to Dismiss Pending Resolution of Motion to Remand* [Doc. 14], *Plaintiffs' Motion to Remand and Memorandum in Support* [Doc. 15], *Motion for Extension of Time to File Reply to Response to Motion to Remand* [Doc. 23], and *Request for Leave to File Reply to Response to Motion for Remand.* [Doc. 26]. Having considered the submissions, the relevant case law, and otherwise being fully advised in the premises, the Court denies the *Motion to Dismiss Plaintiffs' Claims Against Defendants American National Property*

and Casualty Company and American National General Insurance Company [Doc. 12],

grants the *Motion to Dismiss Claims Against Defendant Dennis Rossi* [Doc. 13], denies

the *Motion to Stay Briefing on Motions to Dismiss Pending Resolution of Motion to*

*Remand* [Doc. 14], denies *Plaintiffs' Motion to Remand and Memorandum in Support*

[Doc. 15], denies the *Motion for Extension of Time to File Reply to Response to Motion to*

*Remand* [Doc. 23], and grants the *Request for Leave to File Reply to Response to Motion*

*for Remand*. [Doc. 26].

## I.     BACKGROUND

On May 27, 2011, Plaintiffs Julie A. Downey and James D. Downey filed their

*Verified Complaint for Declaratory Relief* [Doc. 1-1] against Defendants American

National Property and Casualty Company and American National General Insurance

Company (collectively, hereinafter referred to as "ANPAC"), as well as Defendant

Dennis Rossi, a licensed New Mexico agent and broker for ANPAC, in the First Judicial

District of the State of New Mexico.  The *Complaint* alleged that Mrs. Downey "was

involved in a violent motor vehicle accident" caused by an underinsured motorist on

February 8, 2007. [Doc. 1-1 at 9-10]  Although Plaintiffs had rejected

uninsured/underinsured motorist (UM) coverage in an amount equal to their bodily injury

and property damage liability limits, the *Complaint* alleged that this rejection was "void

and ineffective" under the New Mexico Motorists Statute, NMSA 1978, § 66-5-301 and

recent New Mexico Supreme Court authority.  [Doc. 1-1 at 12; Doc. 1-2 at 15] Plaintiffs

sought declaratory relief on behalf of themselves, and a class of similarly situated

2

individuals, including:

> All New Mexico policyholders to whom ANPAC issued an [Mandatory
> Financial Responsibility (MFRA)]/UM policy or renewal policy which was
> in force on or after December 12, 1990, where such policy or renewal
> policy provided less than equal limits UM coverage and ANPAC did not
> obtain a written rejection of the equal limits UM coverage in a form which
> also notified the policyholder of the premium prices for each limit of UM
> coverage available to them under the UM statute.

[Doc. 1-1 at 13]

In their prayer for relief, Plaintiffs requested the following: (1) certification of the

class [Doc. 1-1 at 19]; (2) "additional coercive, injunctive relief in the form of a

Supplemental Declaratory Judgment declaring that every New Mexico MFRA/UM policy

or renewal policy issued by ANPAC in New Mexico on or after December 12, 1990,

where such policy provided less than equal limits UM coverage, is now retroactively

reformed to provide equal limits UM coverage due to ANPAC's failure to obtain a valid

written rejection of the equal limits UM coverage as required under NMSA 1978, § 66-5-

301, NMAC § 13.12.3.9, and the Supreme Court's holding" in Jordan v. Allstate Ins. Co.,

2010-NMSC-051, 149 N.M. 162, 245 P.3d 1214 [Doc. 1-1 at 19]; (3) "additional

coercive, injunctive relief in the form of a Supplemental Declaratory Judgment ordering

ANPAC to promptly identify and provide reasonable and adequate notice, at ANPAC's

sole expense" to members of the class, "informing them, in a manner understandable to

the non-expert insured, that all of their policies and renewal policies issued or renewed on

or after December 12, 1990, are now retroactively reformed to automatically include free

equal limits UM coverage, without the need for the payment of any additional premium,

and further advising such class member policyholders that they should seek the advice of an independent attorney concerning the meaning of the notice and its possible application to them"; [Doc. 1-1 at 19-20]; (4) "additional coercive, injunctive relief in the form of a Supplemental Declaratory Judgment" ordering ANPAC, at its sole expense, to identify and notify class members who "suffered any bodily injury or property damage as a result of the negligence of an uninsured or underinsured motorist, where such claim was pending on or after December 12, 1990" that they may be entitled to recover additional UM benefits, regardless of whether they previously had filed a UM claim, received payment on a UM claim, made a claim for UM benefits that was denied, or settled with a tortfeasor, and informing the class members that they should consult with an independent attorney; [Doc. 1-1 at 20]; (5) "additional coercive, injunctive relief in the form of a Supplemental Declaratory Judgment Ordering that a Special Master be appointed, to be paid at ANPAC's sole expense, to oversee ANPAC's prompt and diligent compliance with the notice provisions of the Court's" declaratory judgment; (6) an award of reasonable costs; and (7) an award of attorneys' fees. [Doc. 1-1 at 21]

On July 1, 2011, Defendants filed a *Notice of Removal* [Doc. 1] based "upon the Class Action Fairness Act ("CAFA") pursuant to 28 U.S.C. § 1332(d) and, alternatively, the diversity of citizenship between the parties pursuant to 28 U.S.C. § 1332(a)." [Doc. 1 at 2] The *Notice* alleged that this Court "has original jurisdiction pursuant to CAFA because (1) the proposed class has at least 100 putative class members; (2) the class asserts an aggregate amount in controversy of $5,000,000 or more; (3) minimal diversity

4

exists; and (4) no CAFA exceptions apply." [Doc. 1 at 2]  The *Notice* further alleged that diversity of jurisdiction existed, even though Rossi was a New Mexico Defendant, because Plaintiffs had "failed to allege a valid cause of action against Mr. Rossi or even to seek any relief against him" and, therefore, he should be dismissed from the case or, alternatively, severed "pursuant to the doctrines of fraudulent joinder and misjoinder." [Doc. 1 at 3]

On July 8, 2011, ANPAC filed a *Motion to Dismiss Plaintiffs' Claims Against Defendants American National Property and Casualty Company and American National General Insurance Company* [Doc. 12] for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  Specifically, ANPAC contended that Plaintiffs' *Complaint* "presents no 'actual controversy'" because it does not "allege that ANPAC refused to reform [Plaintiffs'] policy" in accordance with <u>Jordan</u> nor does it allege that Plaintiffs "have a UM/UIM claim under their ANPAC Policy that ANPAC refused to handle consistent with <u>Jordan</u>." [Doc. 12 at 2].  On the same date, Defendant Rossi filed a *Motion to Dismiss Claims Against Defendant Rossi* [Doc. 13].  Defendant Rossi contended that Plaintiffs' *Complaint* fails to state a claim under Fed. R. Civ. P. 12(b)(6) because "Plaintiffs do not allege any conduct on the part of Rossi that has injured them in the past or that will injure them in the future, nor do they seek any relief from Rossi." [Doc. 13 at 1]  Alternatively, Defendant Rossi contended that Plaintiffs' *Complaint* should be dismissed under Fed. R. Civ. P. 12(b)(1) for lack of standing, because Plaintiffs "have failed to allege that they have suffered or will suffer any 'injury in fact' as a result of conduct attributable to

Rossi." [Doc. 13 at 2]

Plaintiffs filed a *Motion to Stay Briefing On Motions to Dismiss Pending Resolution of Motion to Remand*. [Doc. 14] They argued that, because this court is a court of limited jurisdiction, it should "not decide the merits of a removed case until it has satisfied itself that jurisdiction exists." [Doc. 14 at 2]  In light of Plaintiffs' intent to file a motion to remand this case back to state court, Plaintiffs asked this Court to issue an "Order staying briefing on Defendants' Motions to Dismiss pending resolution of Plaintiffs' Motion to Remand." [Doc. 14 at 4]  Defendants opposed the *Motion to Stay*, arguing that although the Court "certainly has the discretion to decide the Motion to Remand first or to decide the motions concurrently, that does not justify postponing briefing of the motions to dismiss.  That one motion may be decided before another does not require or warrant a halt to the judicial proceedings." [Doc. 16 at 1]

On September 13, 2011, this Court *sua sponte* issued an order requiring Plaintiffs to file their responses to Defendants' *Motions to Dismiss*. [Doc. 22]  The Court recognized that a *Motion to Stay Briefing* had been filed, but noted that "[t]he mere filing of a motion to stay does not automatically stay proceedings or extend deadlines." [Doc. 22]  Accordingly, the Court ordered Plaintiffs to file their responses to Defendants' *Motions to Dismiss*, if any were to be filed, on or before September 15, 2011.

Plaintiffs timely filed their responses to Defendants' *Motions to Dismiss* in accordance with the Court's *Order*. [Docs. 24 and 25]  Plaintiffs contended that an actual controversy and an injury-in-fact exist in this case because ANPAC and Rossi sold

6

Plaintiffs an insurance policy that violated New Mexico law, Plaintiffs were damaged by the inadequate insurance policy, and a favorable decision will redress the harm in the form of actual damages for the Downeys and notice to the class members regarding their rights under New Mexico law. [Doc. 25 at 3; Doc. 24 at 5]  In their replies, Defendants alleged that Plaintiffs' *Complaint* does not seek monetary damages and that the Downeys' insurance policy already was reformed by the issuance of the Supreme Court's decision in Jordan and, therefore, neither the case-in-controversy nor the injury-in-fact requirements had been satisfied. [Docs. 29 and 30]

On July 29, 2011, Plaintiffs filed *Plaintiffs' Motion to Remand and Memorandum in Support*. [Doc. 15] They argued that the case should be remanded to state court because "ANPAC has failed to demonstrate an amount in controversy sufficient to meet CAFA requirement." [Doc. 15 at 8]  Specifically, Plaintiffs contended that federal jurisdiction did not exist because ANPAC had failed to establish that the "projected costs of compliance with the class relief requested, i.e., notifying insureds" exceeded $5,000,000 and because ANPAC's "estimates and extrapolations yield baseless and speculative results, which are insufficient to satisfy the jurisdictional minimum." [Doc. 15 at 8, 12]  With respect to diversity jurisdiction, Plaintiffs contended that Defendant Rossi properly was joined as a non-diverse Defendant because "[t]he factual basis of the claims against Rossi and ANPAC are identical" and the *Complaint* seeks damages against Defendant Rossi on behalf of the Downeys under the New Mexico Insurance Trade Practices Frauds Act. [Doc. 15 at 20]

## II.    DISCUSSION

### A.    _Motion for Extension of Time to File Reply to Response to Motion for Remand_ [Doc. 23]; _Request for Leave to Reply to Response to Motion to Remand_ [Doc. 26]

On September 14, 2011, Plaintiffs filed a _Motion for Extension of Time to File a Reply to Response to Motion to Remand._ [Doc. 23]  In support of their motion, Plaintiffs stated that "[t]he requested extension is very short and requests until Tuesday, September 19, 2011.  Opposing counsel was contacted and was unavailable." [Doc. 23]  Defendants filed a response stating that they "do not oppose the motion." [Doc. 28]  However, on September 16, 2011, Plaintiffs filed a _Request for Leave to File a Reply to Response to Motion to Remand_ [Doc. 26], in which they withdrew their prior _Motion for Extension of Time to File a Reply to Response to Motion to Remand._  Plaintiffs explained that "Plaintiffs' counsel, Lee R. Hunt, failed to properly calendar the date for the Reply" and that "the reply was due on September 9, 2011." [Doc. 26 at 1-2]  Given that the deadline for the filing of the reply had lapsed, Plaintiffs sought permission to file a late reply, pursuant to Fed. R. Civ. P. 6(b), and attached their proposed reply to their motion. Plaintiffs stated that "[o]pposing counsel was contacted, but was unavailable." [Doc. 26 at 3]  No response to this motion was ever filed.

In light of Plaintiffs' withdrawal of their _Motion for Extension of Time to File Reply to Response to Motion for Remand_ [Doc. 23], this motion is denied as moot. Turning to Plaintiffs' request to file a late reply to the motion to remand, Fed. R. Civ. P. 6(b)(1)(B) provides as follows: "When an act may or must be done within a specified

time, the court may, for good cause, extend the time . . . on motion made after the time

has expired if the party failed to act because of excusable neglect." Excusable neglect is

an "elastic concept" that empowers courts to accept late filings caused by inadvertence,

mistake, or carelessness, as well as by intervening circumstances beyond the party's

control. Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 392

(1993) (internal quotation marks and citation omitted). The determination of whether

neglect is excusable "is at bottom an equitable one, taking account of all relevant

circumstances surrounding the party's omission." Id. at 395. Such circumstances include

"the danger of prejudice to the [nonmoving party], the length of the delay and its potential

impact on judicial proceedings, the reason for the delay, including whether it was within

the reasonable control of the movant, and whether the movant acted in good faith." Id.

In this case, there is no danger of prejudice to Defendants by permitting the filing

of a late reply to the response to the *Motion to Remand*. Indeed, given that Defendants

did not oppose Plaintiffs' *Motion for Extension of Time* to file a late reply [Doc. 28] and

did not file an opposition to Plaintiffs' *Request for Leave to Reply to Response to Motion

to Remand* [Doc. 26], the Court may conclude that they "consent to grant the motion."

D.N.M.LR-Civ. 7.1(b). Additionally, the length of the delay is minor. Plaintiffs' reply

was due on September 9, 2011, but "[d]ue to counsel's failure to properly calendar the

deadline, counsel believed the Reply was due one week later . . . [on] September 16,

2011." [Doc. 26 at 2] Plaintiffs filed their *Motion for Extension of Time* on September

14, 2011 [Doc. 23] and their *Request for Leave to File Reply* [Doc. 26] two days later, on

September 16, 2011. Given the minor length of this one-week delay, and the fact that Plaintiffs' reply was attached to their *Request for Leave to File Reply* [Doc. 26], the potential impact on judicial proceedings is inconsequential. The reason for the delay was counsel's failure to properly calendar the deadline for the reply. [Doc. 26] Although the calendaring of the deadline was within the reasonable control of Plaintiffs, there is no suggestion that this error occurred in bad-faith. Under these circumstances, the Court concludes that excusable neglect exists. See Reyes v. Unknown Agent (Badge 101), et al., No. 09cv069 MCA/WDS, Doc. 25 at 6-7 (D.N.M. January 13, 2010) (permitting the filing of a late answer when the defendant's counsel failed to properly calendar the deadline); Scott v. Power Plant Maint. Specialists, Inc., No. 09-2591-KHV, 2010 WL 1881058, at * 3 (D. Kan. May 10, 2010) ("Generally, courts are more forgiving of missed deadlines caused by clerical calendaring errors, mathematical miscalculations of deadlines and mishandling of documents."). Accordingly, Plaintiffs' *Request for Leave to Reply to Response to Motion to Remand* [Doc. 26] is hereby granted.

B.   *Plaintiffs' Motion to Remand and Memorandum in Support* [Doc. 15]

Federal law provides that the United States District Courts have original jurisdiction over all civil actions where the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states. See 28 U.S.C. § 1332(a). An action initially brought in a state court may be removed to a federal district court pursuant to the authority set forth in 28 U.S.C. § 1441, which states, in pertinent part, that

[e]xcept as otherwise expressly provided by Act of Congress, any civil

10

action brought in a State Court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district Court of the United States for the district and division embracing the place where such action is pending.

28 U.S.C. § 1441(a).

Removal statutes are strictly construed, and any doubts about the propriety of removal are resolved in favor of remand.  See City of Neodesha v. BP Corp. N. Am., 355 F.Supp.2d 1182, 1185 (D. Kan. 2005) (quoting Boyer v. Snap-on Tools Corp., 913 F.2d 108, 111 (3rd Cir.1990)).  When removal is challenged, the burden rests with the removing party to prove that jurisdiction exists.  In this regard, diversity jurisdiction depends upon all parties to one side of the case having a different citizenship from all parties to the opposing side.  Id.

The Court begins its analysis with a review of the statutory scheme governing CAFA claims.  CAFA amended basic diversity jurisdiction in 28 U.S.C. § 1332

> to confer federal jurisdiction over class actions involving at least 100 members and over $5 million in controversy when minimal diversity (between any defendant and any plaintiff class member) is met. CAFA also added its own removal statute, permitting any defendant to remove a qualifying action without regard to the residence or consent of other defendants, see 28 U.S.C. § 1453(b), and providing discretionary appellate review of rulings on motions for remand notwithstanding the extant bar in 28 U.S.C. § 1447(d) to appeals from remand orders, see 28 U.S.C. § 1453(c)(1).

Prime Care of Ne. Kan., LLC v. Humana Ins. Co., 447 F.3d 1284, 1285 (10th Cir. 2006).  In this case, Plaintiffs do not dispute that the class involves at least 100 members and that minimal diversity exists between Plaintiffs and Defendants.  Plaintiffs do dispute,

11

however, the amount in controversy, arguing that removal was improper under CAFA because the aggregate amount in controversy does not exceed $5 million. See 28 U.S.C. § 1332 (d)(6) (providing for the aggregation of claims under CAFA).

"In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 347 (1977). "The Tenth Circuit has followed what has commonly been referred to as the 'either viewpoint rule" which considers either the value to the plaintiff or the cost to defendant of injunctive and declaratory relief as the measure of the amount in controversy for purposes of meeting the jurisdictional minimum." Lovell v. State Farm Mut. Auto. Ins. Co., 466 F.3d 893, 897 (10th Cir. 2006). Thus, to determine the amount in controversy, courts "look to the pecuniary effect an adverse declaration will have on either party to the lawsuit." City of Moore, Okl. v. Atchison, Topeka, & Santa Fe Ry. Co., 699 F.2d 507, 509 (10th Cir. 1983).

In McPhail v. Deere & Co., 529 F.3d 947, 953 (10th Cir. 2008), the Tenth Circuit Court of Appeals acknowledged the difficulty of proving "facts in support of the amount in controversy by a 'preponderance of the evidence'," given that "in most removal cases, there is little 'evidence' one way or another." To resolve this "jurisprudential mess," the Court held that "[t]he preponderance of the evidence' standard applies to jurisdictional facts, not jurisdiction itself." Id. at 954 (quoting Meridian Sec. Ins. Co. v. Sadowski, 441 F.3d 536, 540-41 (7th Cir. 2006)). Thus, "[w]hat the proponent of jurisdiction must

12

'prove' is contested factual assertions . . . [j]urisdiction itself is a legal conclusion, a

*consequence* of fact rather than a provable 'fact.'" Id. (quoting Meridian, 441 F.3d at 540-

41).

> Once the facts have been established, uncertainty about whether the
> plaintiff can prove its substantive claim, and whether damages (if the
> plaintiff prevails on the merits) will exceed the threshold, does not justify
> dismissal.  Only if it is 'legally certain' that the recovery (from the
> plaintiff's perspective) or cost of complying with the judgment (from
> defendant's) will be less than the jurisdictional floor may the case be
> dismissed.

Id. at 955 (quoting Meridian, 441 F.3d at 543); see Meridian, 441 F.3d at 541 ("Although

the proponent of jurisdiction may be called on to prove facts that determine the amount in

controversy . . . once these facts have been established the proponent's estimate of the

claim's value must be accepted unless there is 'legal certainty' that the controversy's

value is below the threshold.").  To establish the amount in controversy when the

complaint is silent on the issue of damages, "the defendant may rely on an estimate of the

potential damages from the allegations in the complaint," McPhail, 529 F.3d at 955,

documentation "beyond the complaint itself," such as interrogatories or affidavits, id. at

956, and proposed settlement offers that appear "to reflect a reasonable estimate of the

plaintiff's claim."  Id.

Although CAFA was intended to create broad federal jurisdiction over class

actions that meet CAFA's jurisdictional requirements, the Circuit Courts uniformly have

held that "CAFA does not change the traditional rule that the party seeking to remove the

case to federal court bears the burden of establishing federal jurisdiction."  Evans v.

Walter Indus., Inc., 449 F.3d 1159, 1164 (11th Cir. 2006); see also Blockbuster, Inc. v.

Galeno, 472 F.3d 53, 58 (2d Cir. 2006) (holding that "CAFA did not change the

traditional rule and that defendant bears the burden of establishing federal subject matter

jurisdiction"); Morgan v. Gay, 471 F.3d 469, 473 (3rd Cir. 2006) ("Under CAFA, the

party seeking to remove the case to federal court bears the burden to establish that the

amount in controversy requirement is satisfied."); Brill v. Countrywide Home Loans, Inc.,

427 F.3d 446, 447 (7th Cir. 2005) (holding that CAFA does not alter the rule that the

"proponent of federal jurisdiction" bears "the burden of persuasion of the amount in

controversy"); Abrego Abrego v. The Dow Chemical Co., 443 F.3d 676, 686 (9th Cir.

2006) (holding that CAFA "does not alter the longstanding rule that the party seeking

federal jurisdiction on removal bears the burden of establishing that jurisdiction").  The

Tenth Circuit has not yet addressed this issue, but "multiple district court cases in the

Tenth Circuit are in accord."  Stanforth, Jr. v. Farmers Ins. Co. of Arizona, No.

09CV1146 RLP/RHS, Doc. 40 at 4 (D.N.M. April 22, 2010) (quoting Apodaca v. Allstate

Ins. Co., 2008 WL 113844, *3 (D. Colo. Jan. 9, 2008)).  Accordingly, Defendants bear

the burden to prove, by a preponderance of the evidence, the jurisdictional facts necessary

to determine the amount in controversy.

In their *Notice of Removal*, Defendants alleged facts to prove that both the value of

the requested relief, as well as the costs of such relief to Defendants, both exceed $5

million.  With respect to the value of the litigation, Defendants alleged that this value

could be calculated based on the difference between "existing [UM] limits and [bodily

14

injury] limits on policies within the putative class." To calculate this amount, Defendants submitted the declaration of Gary Horsman, a Management Systems Consultant for ANPAC. [Doc. 1-3, Ex. B] Mr. Horsman averred that "ANPAC has approximately 3,904 policies . . . currently in force where the [UM] coverage limits stated on the declarations page are less than the corresponding [bodily injury] limits" and that reformation of ANPAC's current policies "would, alone, result in an aggregate coverage increase exceeding $560 million. . . . The total reformation value to all putative class members dating back to December 12, 1990, would be much higher. Additionally, these figures do not account for the substantial increases in coverage that would result from stacking or using per-occurrence limits rather than per-person limits." [Id.]

With respect to the costs to Defendants, Defendants presented two methods of valuation: (1) premiums lost "by ANPAC having to reform policies and provide additional coverage without receiving any payment for additional risk" [Doc. 1 at 9] and (2) additional claims under reformed UM policies. With respect to lost premiums, Mr. Horsman used "a method . . . based on the average premium that ANPAC collects per dollar of UM-[Bodily Injury] limits exposure," to estimate that Plaintiffs' requested relief would result in "lost premium of approximately $12.8 million from January 1, 1993 through December 21, 2010." [Doc. 1-3 at 3] This estimate was based on the following data:

> A = The total sum of UM-[Bodily Injury] premiums that ANPAC actually
> earned in New Mexico from January 1, 1993 through January 31, 2010 =
> $7,655,020

B = [I] The aggregate sum of the per-person [Bodily Injury] limits (equal, by definition, to the *reformed* UM-[Bodily Injury] limits (unstacked) that Plaintiffs demand) for each policy in force at the end of each year from 2005 through 2010 ($5,156,725,000), divided by [ii] the aggregate sum of all *unreformed* per-person UM-[Bodily Injury] limits (unstacked) for each policy in force at the end of each year from 2005 through 2010 ($1,925,925,000) = 2.68

Mr. Horsman multiplied A times B (7,655,020 x 2.68 = $20,515,453.60) to calculate "an estimate of the premiums ANPAC would have earned if its insureds had all paid for reformed, equal limits UM-[Bodily Injury] coverage." "When the amount that ANPAC actually earned for UM-[Bodily Injury] coverage (A) is subtracted from the estimate of what it would have earned (A x B), the difference ((A x B) - A) is an estimate of the *additional* premium that ANPAC would have earned if the putative class members had to pay for reformed UM-[Bodily Injury] coverage limits in the same amount as their policies' [Bodily Injury] limits." [Doc. 1-3 at 3]

Lastly, ANPAC submitted evidence regarding the amount of its exposure to additional claims under Plaintiffs' reformed UM-Bodily Injury policies. Based on the "average claim payment per dollar of UM-[Bodily Injury] limits exposure," Mr. Horsman estimated that Plaintiffs' requested relief would result in additional claim payments of $6,638,511. [Doc. 1-3 at 3] This estimate was based on the following data:

C = The aggregate amount that ANPAC has paid, or reserved for potential payment, for New Mexico UM-[Bodily Injury] claims with dates of loss from January 1, 1991, through December 31, 2010 = $3,951,494.67.

D = The ratio of aggregate [Bodily Injury] limits (reformed UM-[Bodily Injury] limits) divided by aggregate UM-[Bodily Injury] limits, as defined . . . above = 2.68

Mr. Horsman multiplied C times B ($3,951,494.67 x 2.68 = $10,500,005.72) to estimate "the amount of UM-[Bodily Injury] claim payments ANPAC would have made, for dates of loss between January 1, 1990 through December 31, 2010, if ANPAC had to pay claims in the context of 2.68-times-greater risk exposure associated with" Plaintiffs' reformed policies.  Mr. Horsman then subtracted from this total "the amount that ANPAC actually has paid or reserved for potential payment ($3,951,494.67 = C)" to yield "an *additional* . . . claim liability of approximately $6,638.511 associated with Plaintiffs' requested relief." [Doc. 1-3 at 3-4]

ANPAC also submitted the Declaration of Krista Watkins Hilton, a Litigation Administrator for ANPAC. [Doc. 1-4 at 1]  Ms. Hilton used a different method to valuate the amount of ANPAC's exposure to additional claims under Plaintiffs' reformed UM-Bodily Injury policies.  Ms. Hilton reviewed 32 UM claims "made with dates of loss from June 1, 2005, through June 1, 2011," and estimated that the value of the additional claim benefits would be $3.1 million for these 32 claims.  "Of note, this estimate includes $705,000 claimed by the Downeys themselves."  Ms. Hilton then used the $3.1 million figure to estimate the amount in controversy associated with reformed UM-[Bodily Injury] limits claims for the period between January 1, 1991, through December 31, 2004. "To account for both the relatively greater period of time from January 1, 1991, through December 31, 2004 . . . and the possible impact of differences in the relative size of ANPAC's book of business during those time periods," Ms. Hilton multiplied the $3.1 million figure by the following quotient:

17

> The sum of the number of vehicles in force at the end of each year for the years 1992 through 2004 is 44,804. This number is divided by the sum of the number of vehicles in force at the end of each year for the years 2005 through 2010, 53,159. The resulting quotient is 0.843 = Y.

Multiplying $3.1 million by 0.843 (Y), Ms. Hilton estimated that additional claims for the time period between January 1, 1991 and December 31, 2004 was $2.1 million. Adding this figure to the $3.1 million figure, Ms. Hilton calculated that "the total estimated amount in controversy for claim costs, from January 1, 1991, through June 1, 2011, is approximately $5.7 million. [Doc. 1-4 at 2]

In sum, ANPAC's evidence established the estimated amount in controversy as follows: (1) value to Plaintiffs, as measured by their increased UM policy limits, in the amount of $560 million; (2) cost to Defendants, as measured by their lost premiums, in the amount of $12.8 million; and (3) cost to Defendants, as measured by Plaintiffs' additional claims for payment, in the amount of $6,638,511 based on Mr. Horsman's method of valuation or $5.7 million based on Ms. Hilton's method of valuation. Pursuant to all of these methods of valuation, Defendants argue that the amount in controversy exceeds $5 million and, therefore, Plaintiffs' *Motion to Remand* should be denied.

Plaintiffs contend that Defendants' estimates of the amount in controversy are flawed because Plaintiffs' *Complaint* does not seek monetary damages or the payment of additional UM claims. Instead, Plaintiffs argue, the *Complaint* simply seeks a declaratory judgment requiring Defendants to notify the class members of their rights under New Mexico law and, as such, any "[d]amages, including lost premiums, additional coverage

18

and additional claims" are not attributable to the relief requested, but, rather, "the New Mexico Supreme Court's decision in <u>Jordan v. Allstate</u>." [Doc. 15 at 8]  Because Defendants have failed to produce any evidence demonstrating that the trivial costs of compliance with the class relief requested, i.e. printing and mailing letters to notify insureds, exceeds $5 million, Plaintiffs argue that this Court does not have federal jurisdiction under CAFA.  [<u>Id.</u>]

   <u>Keeling v. Esurance Ins. Co.</u>, 660 F.3d 273 (7th Cir. 2011), is instructive on this point.  In <u>Keeling</u>, the plaintiff policy-holders filed a class action against Esurance Insurance Company, alleging "that the company committed fraud by charging for uninsured or underinsured motorist coverage that is worthless in light of the policy's restrictions." <u>Id.</u> at 274.  The plaintiffs requested prospective injunctive relief, contending that the worthless coverage and the additional premiums should be eliminated from future policies.  The district court held that "the prospective injunctive relief would be costless to Esurance, because the relief would require changing only a few words on a printed form." <u>Id.</u>  The Seventh Circuit Court of Appeals reversed, noting that "this suit is about money, not ink" and that "[i]f the class is right and Esurance must either stop charging a premium or change the terms so that policyholders receive indemnity more frequently, it will suffer a financial loss." <u>Id.</u>  Although the costs of compliance were "uncertain," the Court held that they were "far from trivial" and could "not be ignored in the calculation of the amount in controversy." <u>Id.</u>  Accordingly, the Seventh Circuit reversed the judgment of the district court and remanded the case for a decision on the merits.  <u>Id.</u> at 275

("Considerations such as these are properly part of the damages determination after the merits have been resolved. They should not be smuggled into the jurisdictional inquiry, which is supposed to be simple and mechanical.").

Likewise, this case "is about money, not ink" and the monetary consequences of the Supreme Court's opinion in <u>Jordan</u> cannot "be ignored in the calculation of the amount in controversy." <u>Id.</u> at 274. If class members are not informed of their rights under <u>Jordan</u>, then they are not in a position to exercise those rights by demanding the payment of UM claims in an amount equal to bodily injury liability limits. Indeed, this is the precise benefit contemplated by the *Complaint*, which alleges that notice is necessary to prevent the "the highly probable and substantial financial losses to New Mexico ANPAC policyholders and the subversion of the remedial purpose and intent of the UM statute and the Supreme Court's ruling in <u>Jordan</u>." [Doc. 1-1 at 18-19] Accordingly, the pecuniary effects of the relief requested by Plaintiffs necessarily includes both the benefits of, and the costs of compliance with, the Supreme Court's opinion in <u>Jordan</u>.

Alternatively, Plaintiffs contend that ANPAC has failed to prove the amount in controversy by a preponderance of the evidence. With respect to the value of the benefit to Plaintiffs, Plaintiffs contend that Defendants erroneously arrived at the $560 million figure by relying on the face value of the reformed UM policies, rather than the actual value of the Plaintiffs' underlying UM claims. [Doc. 15 at 13] In support of this contention, Plaintiffs rely on <u>Toller v. Sagamore Ins. Co.</u>, 558 F.Supp.2d 924 (E.D. Ark. 2008). In <u>Toller</u>, the plaintiff filed a declaratory judgment action in state court, on behalf

20

of a class similarly situated insureds, seeking reformation of the insureds' automobile insurance policies to include the minimum amount of UM coverage required by Arkansas law. The defendants removed the case to federal court under CAFA, alleging that the face value of the insureds' reformed automobile insurance policies exceeded the $5 million amount in controversy requirement. Id. at 929. The District Court noted that an "automobile accident is not an 'event bound to happen,'" and, therefore, "even when claims are made under such policies, the policy limits are not necessarily paid by the insurance company." Toller v. Sagamore Ins. Co., 514 Supp.2d 1111, 1119 (E.D. Ark. 2007). Accordingly, the Court held that the amount in controversy is measured by the value of the plaintiffs' claim, rather than "the face value of the no-fault coverage at issue." Id. at 1120; see also Raspberry v. Capitol County Mut. Fire Ins. Co., 609 F.Supp.2d 594, 601 (E.D. Tex. 2009) (holding that the plaintiffs' request for declaratory judgment and injunctive relief affected the insurer's "*obligation to pay*" and, consequently, "the amount in controversy [under CAFA] must be measured by the value of the underlying claim rather than the face amount of the policies at issue." (emphasis in original)); Charles Alan Wright et al., Federal Practice & Procedure § 3710 (4th Ed. 2011) ("A distinction should be drawn . . . between those cases in which the validity of the insurance policy is at issue, and those cases in which the question is the applicability of the policy to a particular occurrence. In the latter category of cases apparently the jurisdictional amount in controversy is measured by the value of the underlying claim against the insured–not the face amount of the policy–and many cases seem to so hold.").

21

In consideration of the foregoing authorities, the Court concludes that the face value of the class members' reformed UM policies does not accurately represent the amount in controversy. Stated simply, the class members will not receive nor will ANPAC have to pay $560 million in UM benefits and, therefore, this amount overestimates the actual value to Plaintiffs, as well as the actual cost to Defendants. Accordingly, Defendants' $560 million figure is hereby rejected.

Defendants have proffered two alternate methods of calculating the amount in controversy. One of those methods is ANPAC's lost premiums, i.e., the amount of money the class members would have had to pay to purchase the benefit of UM liability coverage equal to bodily injury liability limits. In Toller, the Eastern District of Arkansas adopted this method of valuation to determine the amount in controversy under CAFA. See 558 F.Supp.2d at 931 ("The amount in controversy, when measured by the value of the object of the litigation from the vantage point of the defendant, exceeds $5,000,000, because the value of the insurance coverage–measured by the amount that [the defendant] charged for the coverages at issue–exceeds $10,000,000."). However, the Court has been unable to find any other cases employing this method of valuation. Additionally, if the face value of the policy does not accurately represent the amount in controversy, the Court fails to see how the amount of premiums the plaintiffs would have had to pay to receive the face value of the policy is a more accurate measure. Stated another way, if the benefit to the class members is illusory, then it seems as if the cost of providing that benefit is equally illusory.

Thus, the Court is left with the third method of valuation, the estimate of Plaintiffs' additional claims for payment.  Plaintiffs concede that, if "Defendants are correct that the damages associated with reformed policies pursuant to <u>Jordan</u> should be used in calculating the jurisdictional amount in controversy in this case," then the proper method of valuation is the value of Plaintiffs' underlying claims.  [Doc. 15 at 13]  <u>See</u> Charles Alan Wright et al., <u>supra</u> § 3710.  Plaintiffs contend, however, that ANPAC's evidence concerning the amount of Plaintiffs' claims is "unreliable," "self-serving," "conclusory" and "speculative."  The Court disagrees.  ANPAC submitted two estimates of this amount: (1) Mr. Horsman's estimate in the amount of $6,638,511, which was based on the average claim payment per dollar of UM-[Bodily Injury] limits exposure and (2) Ms. Hilton's estimate in the amount of $5.7 million, which was based on 32 UM claims made with dates of loss from June 1, 2005, through June 1, 2011.  Although both of these figures are estimates, they are reasonable extrapolations supported by facts and data submitted to the Court.  This is sufficient to fulfill Defendants' burden of proof at this stage of the litigation.  <u>See McPhail</u>, 529 F.3d at 956 ("The amount in controversy is not proof of the amount the plaintiff will recover. Rather, it is an estimate of the amount that will be put at issue in the course of the litigation."); <u>Armour v. Transamerica Life Ins. Co.</u>, No. 11–2034–KHV 2011 WL 1699281, at * 3 (D. Colo. May 4, 2011) (rejecting the plaintiffs' claim that the evidence supporting the amount in controversy was speculative and conclusory).

To support their contention to the contrary, Plaintiffs rely on <u>Rebman v Follett Higher Educ. Group, Inc.</u>, 248 F.R.D. 624 (M.D.Fl. 2008), <u>Rodgers v. Central Locating Serv., Ltd.</u>, 412 F.Supp.2d 1171 (W.D.Wash. 2006), and <u>Ongstad v. Piper Jaffray & Co.</u>, 407 F.Supp.2d 1085 (D.N.D. 2006). In <u>Rebman</u>, two students filed a class action alleging, in relevant part, a violation of Florida's Deceptive and Unfair Trade Practices Act, based on the defendant's practice of rounding up the price of used text books by twenty-five cents. The plaintiffs' individual damages amounted to an aggregate total of thirty-one cents. 248 F.R.D. at 632. Although the defendant had sold 1000 used textbooks in each of the six calendar years at issue, there was no evidence "showing how many of those sales resulted in damage to the purchaser as a result of rounding up the price or the aggregate amount of such damage." <u>Id.</u> Accordingly, the Court held that the evidence was insufficient to demonstrate that the amount in controversy exceeded $5 million under CAFA. <u>Id.</u> In <u>Rebman</u>, the evidence indicated that Plaintiffs' damages fell far below the jurisdictional minimum of $5 million (6,000 transactions (1,000 transactions a year, multiplied by six years) x $.25 per transaction = $1,500). By contrast, in this case, Defendants have produced evidence indicating that the plaintiff class members may be entitled to UM benefits in excess of $5 million. Thus, <u>Rebman</u> is distinguishable from the present case.

In <u>Rodgers</u>, the plaintiffs filed a class action for overtime wages under the Washington Minimum Wage Act. The complaint expressly alleged that "the total aggregated amount in controversy of all class members does not exceed $5,000,000."

412 F.Supp.2d at 1179.  Because there was no suggestion that this allegation was made in bad faith, the Court held that "the sum claimed by the plaintiff controls for removal purposes as to the maximum amount in controversy." Id. (internal quotation marks and citation omitted).  However, in addition to these overtime wages, the plaintiffs sought injunctive relief.  The defendant alleged that this injunctive relief related to the payment of *future* overtime wages and, in support thereof, submitted the declaration of its district manager regarding the "typical" amount of overtime worked in "the foreseeable future," which generated an "annual claim rate" of $421,401.  Id. at 1180.  Multiplying this figure "by just ten years," the defendant contended that "Plaintiffs' claim for injunctive relief" was worth $4,214,008.  Id.  The Court held that this evidence was insufficient to establish the amount in controversy because there was no evidence indicating that any of the class members were still employed by the defendant or that they would remain so employed for a sufficient time in the future to support the defendant's estimate of damages.  The Court thus held that it lacked jurisdiction under CAFA and remanded the case back to state court.  Unlike in Rodgers, Defendants' calculation of the amount in controversy in this case is not based on *future* violations, which have not yet occurred.  Plaintiffs' reliance on Rodgers is misplaced

In Ongstad, the plaintiff filed a class action against the defendant securities broker-dealer and investment banking firm for unauthorized securities transactions that resulted in financial losses.  407 F.Supp.2d at 1087.  The defendant removed the case to federal court under CAFA.  In support of the amount in controversy, the defendant submitted

evidence indicating that it had "approximately 16,243 open accounts, held by approximately 11,333 clients, managing in excess of 1 billion dollars." Id. at 1091. The defendant argued that "[e]ven if the unauthorized trading Plaintiffs alleged occurred only in a small percentage of these accounts and involved a small percentage of the assets, [the defendants] liability could easily exceed CAFA's amount in controversy minimum of $5,000,000." Id. The Court held that this evidence was insufficient, observing that it was simply being

> asked to speculate as to the potential large dollar amounts at stake based on the total value of the assets held by [the defendant]. However, as the Plaintiffs correctly note, there is no inherent correlation between the total value of the assets and the amount of damages sustained as a result of unauthorized transactions. The proper measure of damages is the difference between the value of the unauthorized investment at the time it was sold or purchased and its current value. Neither party has provided the Court with a reliable method to determine, or even guesstimate, that amount.

Id. at 1092. By contrast, in this case Defendants have provided the Court with a reliable method to determine the amount in controversy. There is an inherent correlation between the average claim payment per dollar of UM-Bodily Injury limits exposure, as calculated by Mr. Horsman, or the outstanding liability for UM claims made with dates of loss from June 1, 2005 through June 1, 2011, as calculated by Ms. Hilton, and the amount of additional UM benefits to which the Plaintiff class members may be entitled. Accordingly, Ongstad does not support Plaintiffs' *Motion for Remand*.

Defendants have met their burden to prove, by a preponderance of the evidence, the jurisdictional facts necessary to establish that the amount in controversy exceeds $ 5

million.  Because there is no evidence suggesting that ""it is 'legally certain' that the recovery (from the plaintiff's perspective) or cost of complying with the judgment (from defendant's) will be less than the jurisdictional floor," McPhail. at 955 (citation omitted), *Plaintiffs' Motion to Remand and Memorandum in Support* [Doc. 15] is denied.[1]

C.   *Motion to Stay Briefing on Motions to Dismiss Pending Resolution of Motion to Remand* [Doc. 14]

Plaintiffs have moved to stay the briefing on Defendants' motions to dismiss pending the resolution of *Plaintiffs' Motion to Remand*.  Plaintiffs contend that their request for a stay should be granted because the Court must address the issue of subject matter jurisdiction before it addresses a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). [Doc. 14 at 2]  Defendants respond that "[i]t would be more efficient for the parties to brief both the motions to dismiss and Motion to Remand, which allows the Court the option of considering at once the entirety of the issues raised by the respective motions." [Doc. 16 at 1-2]

On September 13, 2011, the Court issued an *Order* requiring Plaintiffs to file their responses to Defendants' motions to dismiss.  See Doc. 22 (noting that "[t]he mere filing of a motion to stay does not automatically stay proceedings or extend deadlines.")  Plaintiffs timely filed their responses [Docs. 24, 25] and briefing on Defendants' motions to dismiss is now complete. [Docs. 32, 33]  Accordingly, Plaintiffs' *Motion to Stay* must be denied as moot.

---

[1]Having concluded that federal jurisdiction exists under CAFA, the Court need not reach Defendants' alternate argument regarding diversity jurisdiction.

27

Nonetheless, as explained in part II.D of this *Memorandum Opinion and Order*, Defendants' motions to dismiss, like *Plaintiffs' Motion to Remand*, challenge this Court's subject matter jurisdiction. See Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997) ("Article III of the United States Constitution limits the jurisdiction of federal courts to actual cases or controversies . . . therefore, [t]o qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." (Internal quotation marks and citations omitted; alteration in original)). If the Court lacks subject matter jurisdiction, then the appropriate remedy is a remand back to state court. See 28 U.S.C. 1447© ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). In the interest of judicial efficiency, *Plaintiffs' Motion to Remand* and Defendants' *Motions to Dismiss* should be decided concurrently.

D.    *Motions to Dismiss*

Under Fed. R. Civ.P. 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." The sufficiency of a complaint is a question of law, and when considering and addressing a motion to dismiss pursuant to rule 12(b)(6), a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006). Further, in order to withstand a rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v.

Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (internal citation omitted) (Iqbal). If a plaintiff cannot nudge the claims "across the line from conceivable to plausible," the complaint must be dismissed. Id. at 570.

In handing down Twombly, the United States Supreme Court invalidated the longstanding rule that a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The Conley standard has proved problematic over the years because it suggests that "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." Twombly, 550 U.S. at 561 (quoting Conley, 355 U.S. at 45-46). As a result, defendants may be forced to bear the burden and expense of discovery before they are afforded a real opportunity to seek the dismissal of groundless claims, while plaintiffs may use the burdensome discovery process as leverage to induce otherwise unjustified settlement of such groundless claims. See Twombly, 550 U.S. at 557-59.

A complaint is now subject to dismissal under the new standard if it does not "possess enough heft to 'sho[w] that the pleader is entitled to relief.'" Twombly, 550 U.S. at 557 (quoting Fed. R. Civ. P. 8(a)(2)). In other words, "the mere metaphysical

possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded

claims is insufficient; the complaint must give the court reason to believe that *this*

plaintiff has a reasonable likelihood of mustering factual support for *these* claims." Ridge

at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007).

Two "working principles" underlie the Twombly standard. Iqbal, 129 S.Ct. at

1949.

> First, the tenet that a court must accept as true all of the allegations
> contained in a complaint is inapplicable to legal conclusions.  Threadbare
> recitals of the elements of a cause of action, supported by mere conclusory
> statements, do not suffice. . . . Second, only a complaint that states a
> plausible claim for relief survives a motion to dismiss.  Determining
> whether a complaint states a plausible claim for relief will . . . be a context-
> specific task that requires the reviewing court to draw on its judicial
> experience and common sense.

Id. at 1949-50 (internal citations omitted).  Thus, in order to evaluate a motion to dismiss,

the Court engages in a two-part inquiry by initially identifying those allegations that are

nothing more than legal conclusions and therefore "not entitled to the assumption of

truth" and then considering whether the factual allegations "plausibly suggest an

entitlement to relief." Id. at 1951.  Accordingly, the Court must begin by evaluating the

elements of the pleaded cause of action, in order to determine whether the complaint

states sufficient factual allegations to implicate a claim for relief.  See id. at 1947.

1.    *Motion to Dismiss Plaintiffs' Claims Against Defendants American National
      Property and Casualty Company and American National General Insurance
      Company* [Doc. 12]

Defendant ANPAC moves to dismiss Plaintiffs' *Complaint*, contending that

30

"Plaintiffs have failed to allege an 'actual controversy,' and have therefore failed to state a claim upon which relief can be granted under the Declaratory Judgment Act." [Doc. 12 at 1]  Specifically, ANPAC stipulates that "the Downeys' insurance policy is reformed by operation of law in accordance with the dictates of <u>Jordan</u>" and, therefore, there is no non-reformation controversy requiring any judicial declaration." [Doc. 12 at 3]  Plaintiffs respond that "ANPAC's stipulation does nothing to extinguish the class claims relating to notice to other insureds, relating to court oversight, or relating to declaratory relief on behalf of the class." [Doc. 25 at 5]  ANPAC replies that Plaintiffs' class claims necessarily are contingent upon their individual claims, and because there is no actual controversy regarding Plaintiffs' individual claims, ANPAC's motion to dismiss should be granted.  [Doc. 29 at 2]

The Declaratory Judgment Act provides as follows: "In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  "[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III" of the United States Constitution." <u>Columbian Financial Corp. v. BancInsure, Inc.</u>, 650 F.3d 1372, 1376 (10th Cir. 2011) (quoting <u>MedImmune, Inc. v. Genentech, Inc.</u>, 549 U.S. 118, 127 (2007)). "The case or controversy requirement is a constitutional imperative; however, the boundaries of Article III's dictates are notoriously murky." <u>Lucero v. Bureau of</u>

31

Collection Recovery, Inc., 639 F.3d 1239, 1242 (10th Cir. 2011). The basic "question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality* to warrant the issuance of a declaratory judgment." Columbian Financial Corp., 650 F.3d at 1376 (quoting MedImmune, Inc., 549 U.S. at 127).

In Columbian Financial Corp., the Tenth Circuit undertook a comprehensive review of the case or controversy requirement in the Declaratory Judgment Act. After reviewing United States Supreme Court case law, the Court observed that, with respect to coverage under a liability insurance policy, the insured must "identify a specific claim or potential claim against it. True, the injured party may not yet have sued the insured. But the *sine qua non* is an identifiable specific claim that has risen above the horizon. Moreover, even if a claim can be identified, there must be a disagreement about coverage." Id. at 1383-84 (citations omitted). The Court found Atlanta Gas Light Co. v. Aetna Casualty & Surety Co., 68 F.3d 409 (11th Cir. 1995) to be illustrative. In that case, the plaintiff had filed a declaratory judgment action seeking the recovery of environmental cleanup costs. However, at the time the complaint was filed, "no one had filed a claim against [the plaintiff], nor had any government agency ordered a clean-up. And the insurers had taken no position on their duties under the policies should future claims be brought." Columbian Financial Corp., 650 F.3d at 1384. The Eleventh Circuit found that there was no case or controversy, even though the insurers had denied similar claims under similar circumstances, because "speculation based on the insurance

32

companies' dealings with other insureds does not present a concrete case or controversy. At the time the complaint was filed, [the plaintiff] could claim neither actual nor threatened injury resulting from the insurer's conduct, nor any injury traceable to the insurance companies at all." Id. (quoting Atlanta Gas Light Co., 68 F.3d at 414-15).

In Columbian Financial Corp., the Court applied these principles to the facts before it. In that case, the insureds brought a declaratory judgment action against its insurer under a claims-made policy whose term ran from May 11, 2007 through May 11, 2010. Id. at 1373. The Court held that, although a case or controversy had existed at the time suit was filed, there no longer was a case or controversy regarding insurance coverage at the time that judgment was entered. The court explained as follows:

> [T]here appears to have been the necessary 'actual controversy' when Columbian initially filed suit. A claim had been made against a Columbian officer, and BancInsure initially disclaimed coverage. But the actual controversy must exist not only at the time the complaint is filed; it must continue until the district court issues its declaratory judgment. . . . The problem in this case is that by the time of judgment, BancInsure had agreed that the Policy covered the only claim that had been made against an insured, the claim against former Columbian officer McGowan. Absent another identifiable claim against Columbian, there was no actual controversy to be resolved in the declaratory judgment action.

Id. at 1381-82. Because there was no real dispute regarding the insurer's obligation to provide insurance coverage, the Court held that the district court lacked jurisdiction.

Turning to the facts of this case, the Court concludes that a case or controversy existed at the time Plaintiffs filed their complaint. According to Plaintiffs' complaint, Mrs. Downey was involved in a violent motor vehicle accident on February 8, 2007 with

an underinsured motorist. [Doc. 1-1 at 10-11] "Mrs. Downey suffered serious permanent injuries to her temporomandibular joints, namely, chronic bilateral, cervico-facial pain dysfunction [MPD Syndrome], and bilateral, temporomandibular joint capsulitis, all directly related to the violent motor vehicle accident of February 8, 2007." [Doc. 1-1 at 11] Although Plaintiffs had rejected UM coverage when they purchased their ANPAC policy, they filed the present declaratory judgment action seeking to declare their rejection "void and ineffective" under New Mexico law. [Doc. 1-1 at 13] In support of their complaint, Plaintiffs attached a letter from ANPAC dated August 4, 2010, in which an ANPAC representative agreed to a proposed settlement with the underinsured motorist and stated that he did "not see an Underinsured Motorist Bodily Injury (UIMBI) exposure under Mrs. Downey's ANPAC New Mexico Automobile policy." [Doc. 1-2 at 19] See Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009) (noting that the court may consider documents and exhibits attached the complaint, so long as the parties do not dispute the documents' authenticity"). Based on the foregoing, the Court concludes that Plaintiffs had an identifiable specific claim for UM benefits under their ANPAC policy and that there was a disagreement about coverage.

ANPAC contends, however, that Plaintiffs' insurance policy was "reformed by operation of law in accordance with Jordan" and thus no case or controversy existed. [Doc. 29 at 1] This argument is similar to the argument raised by Plaintiffs in support of their *Motion to Remand* (i.e., that ANPAC's costs of compliance are attributable to Jordan, rather than the requested declaratory judgment) and is equally as unavailing. At

34

the time Plaintiffs filed their complaint, ANPAC had taken the position that it had no UM

"exposure under Mrs. Downey's ANPAC New Mexico Automobile policy." [Doc. 1-2 at

19] Thus, there was a definite and concrete dispute between the parties "relat[ing] to

legal rights and obligations arising from [a contract] of insurance." AETNA Life Ins. Co.

of Hartford v. Haworth, 300 U.S. 227, 242 (1937) (holding that an insurance contract

dispute satisfied the case or controversy requirement of the Declaratory Judgment Act).

The issuance of the New Mexico Supreme Court's opinion in Jordan did not change the

status of the parties' dispute. Indeed, nothing in Plaintiffs' complaint suggests that

ANPAC had changed its position regarding Plaintiffs' entitlement to UM benefits in light

of Jordan. Thus, a case or controversy existed at the time Plaintiffs' complaint was filed.

However, a case or controversy must exist not only at the time the complaint is

filed, but at all stages of the litigation. Lucero, 639 F.3d at 1242. ANPAC contends that

no case or controversy exists in light of its stipulation with respect to the relief sought on

Plaintiffs' individual claim. [Doc. 12 at 3; see Doc. 1-1 at 13] Plaintiffs contend that,

pursuant to Lucero, 639 F.3d 1239, ANPAC cannot render this class action moot by

conceding "on the class representative's claim, and then allege no standing or no

controversy." [Doc. 25 at 5]

"In light of the relative independence of the class entity from any one party, the

[United States Supreme] Court has recognized the more 'flexible character of the Art. III

mootness doctrine' in the class action context." Clark v. State Farm Mut. Auto. Ins. Co.,

590 F.3d 1134, 1138 (10th Cir. 2009) (quoting U.S. Parole Comm'n v. Geraghty, 445

35

U.S. 388, 400 (1980)).  "[A] certified class becomes an independent juridical entity capable of satisfying the standing requirements of Article III" and, therefore, "the mooting of a named plaintiff's claims *after* class certification does not moot the claims of the class."  Id. (emphasis in original).  However, "*[p]rior* to class certification, the named plaintiffs' failure to maintain a live case or controversy is fatal to the case as a whole," even though "unnamed plaintiffs might have a case or controversy."  Thomas v. Metropolitan Life Ins. Co., 631 F.3d 1153, 1159 (10th Cir. 2011) (emphasis added). There are three "situations in which a class may be certified despite the mooting of the named plaintiff's claim *prior* to the district court's certification decision: (1) when the plaintiff's claim is capable of repetition, yet evading review . . . (2) when the plaintiff's claim is inherently transitory [such] that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires," Clark, 590 F.3d at 1139 (quoting Geraghty, 445 U.S. at 398-400); and (3) when the plaintiff does not accept the tender of a Rule 68 offer of judgment on his or her individual claims "before the court can reasonably be expected to rule on the class certification motion."  Lucero, 639 F.3d at 1250.

The third situation, a plaintiff's rejection of a Rule 68 offer of judgment, is instructive in this case.  In Lucero, the plaintiff, Richard Lucero, "filed a class-action complaint . . . seeking declaratory relief and damages, alleging violation of the Fair Debt Collection Practices Act ('FDCPA') and the New Mexico collection Agency Regulatory Act."  Id. at 1241.  "Included in the complaint were various class-action allegations."  Id.

The defendant "filed its answer and also served Plaintiff with a Rule 68 offer of judgment, offering to settle for $3,001 plus reasonable attorneys' fees and costs incurred to that date." Id. Although Lucero had not accepted the defendant's offer of judgment, the defendant moved to dismiss the case for lack of subject matter jurisdiction. The district court held that the case was moot because "no class has been certified" and "the defendant has satisfied the plaintiff's demand for relief." Id. (internal quotation marks omitted). The court therefore granted the defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

The Tenth Circuit observed that, "if a defendant makes an offer of judgment in complete satisfaction of a plaintiff's claims *in a non-class action,* the plaintiff's claims are rendered moot because he lacks a remaining interest in the outcome of the case." Id. at 1243 (emphasis in original). However, the application of Rule 68 to a class prior to class certification was unclear. Id.; but see Sosna v. Iowa, 419 U.S. 393, 401-03 (1975) (holding that, after class certification, the expiration of the plaintiff's claims does not render the class action moot). After reviewing United States Supreme Court precedent, the Court was compelled to conclude "that a named plaintiff in a proposed class action need not accept an offer of judgment or risk having his or her case dismissed as moot before the court has had a reasonable time to consider the class certification motion." Id. at 1249. Instead, the Court concluded "that a nascent interest attaches to the proposed class upon the filing of a class complaint such that a rejected offer of judgment for statutory damages and costs made to a named plaintiff does not render the case moot

37

under Article III." Id. "This is so because, notwithstanding the rejected offer of judgment, the proposed class action continues to involve 'sharply presented issues in a concrete factual setting' and 'self-interested parties vigorously advocating opposing positions." Id. (quoting United States Parole Comm'n v. Geraghty, 445 U.S. 388, 403 (1980)). Because "the personal stake of the class inheres prior to certification," the Court held that "the federal Court's Article III jurisdiction to hear the motion for class certification is not extinguished by the Rule 68 offer of judgment to an individual plaintiff." Id. Notably, the Court found no principled basis on which to "distinguish the case in which a class certification motion is pending or filed within the duration of the offer of judgment" from one in which it is not, given that "any Article III interest a class may or may not have in a case is or is not present from its inception." Id.; but see Clark, 590 F.3d at 1139 (noting that "where a plaintiff has had ample time to file the class certification motion, district courts adhere to the general rule that the mooting of a named plaintiff's claim prior to class certification moots the entire case").

Although ANPAC did not tender a Rule 68 offer of judgment, it has stipulated to provide Plaintiffs with the individual relief that they requested. Pursuant to Lucero, ANPAC's stipulation does not render this case moot because the proposed class has a "nascent interest" in the case that "attache[d] . . . upon the filing of [the] class complaint." Lucero, 639 F.3d at 1243. Additionally, the present case is "at so early a point in the litigation that the named plaintiff could not have been expected to file a class certification motion." Clark, 590 F.3d at 1139. Accordingly, ANPAC's *Motion to Dismiss Plaintiffs'*

*Claims Against Defendants American National Property and Casualty Company and*

*American National General Insurance Company* [Doc. 12] is denied.

2.      *Motion to Dismiss Claims Against Defendant Dennis Rossi* [Doc. 13]

Defendant Rossi moves to dismiss Plaintiffs' complaint pursuant to Fed. R. Civ. P.

12(b)(6) and 12(b)(1) because "Plaintiffs do not allege any conduct on the part of Rossi

that has injured them in the past or that will injure them in the future, nor do they seek

any relief from Rossi." [Doc. 13 at 1]  Plaintiffs respond that Rossi engaged in wrongful

conduct because he "sold the insurance policies purchased by Plaintiffs" in violation of

"the New Mexico Insurance Trade Practices Frauds Act, NMSA 1978, §§ 59A-16-3 and

591A-15-4" and that "[u]nder a broad reading of the Complaint, damages are sought on

behalf of the Downeys individually against Rossi." [Doc. 24 at 3-4]

"For purposes of ruling on a motion to dismiss for want of standing, both the trial

and reviewing courts must accept as true all material allegations of the complaint, and

must construe the complaint in favor of the complaining party." Ward v. Utah, 321 F.3d

1263, 1266 (10th Cir. 2003) (quoting Warth v. Seldin, 422 U.S. 490, 501 (1975)).  To

establish Article III standing, "a plaintiff must demonstrate that (1) he or she has suffered

an injury in fact; (2) there is a causal connection between the injury and the conduct

complained of; and (3) it is likely that the injury will be redressed by a favorable

decision." Id. (internal quotation marks and citation omitted).  "These three elements of

standing are an indispensable part of the plaintiff's case and thus the plaintiff must

support each element with the manner and degree of evidence required at the successive

stages of the litigation." Id. (internal quotation marks and citation omitted).

Turning to the third prong of the standing test, redressability, the Court notes that "[t]he requirement of redressability ensures that the injury can likely be ameliorated by a favorable decision." Coll v. First American Title Ins. Co., 642 F.3d 876, 891 (10th Cir. 2011) (internal quotation marks and citation omitted). "[C]onstitutional standing requires a court to ask not only whether an injury has occurred, but whether the injury that has occurred may serve as the basis for a legal remedy in the federal courts." Bd. of County Comm'rs v. Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002) (internal quotation marks and citation omitted). Notably, "'[i]t must be the effect of the court's judgment on the defendant that redresses the plaintiff[s'] injury, whether directly or indirectly.'" Coll, 642 F.3d at 892 (quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1158 (10th Cir.2005) (on reh'g)). "The plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every injury." Id. (quoting Gandy, 416 F.3d at 1158).

Rossi contends that Plaintiffs' injuries are not redressable by a declaratory judgment against him because "it is ANPAC, not Rossi who . . . needs to reform Plaintiffs' policy and afford Plaintiffs the additional UM/UIM coverage under Jordan." [Doc 13 at 5-6] Plaintiffs do not challenge the basic premise that, because Rossi is not a party to the insurance contract, a declaratory judgment regarding contract reformation will not redress the alleged injuries caused by Rossi. Instead, Plaintiffs argue that "[u]nder a broad reading of the Complaint," they have stated a claim for damages against

Rossi based on a violation of the New Mexico Insurance Trade Practices Frauds Act (the

Act). [Doc. 24 at 4]  In support thereof, Plaintiffs rely on paragraph 37 of the Complaint,

which provides as follows:

> 37.  As well, the ANPAC UM sales form signed by Mr. Downey is void
> and ineffective, because ANPAC's use of the sales form under the
> circumstances described above, constitutes an unfair and deceptive
> sales practice respecting the use of UM coverage, which prevented
> the Downeys from making an informed and intelligent decision
> about whether to exercise their right to purchase higher UM limits at
> the same time they were purchasing higher MFRA limits under their
> ANPAC policy, all in violation of the New Mexico Insurance Trade
> Practices Frauds Act, NMSA 1978 §§ 59A-16-3 and 59A-15-4.

[Doc. 1-1 at 12]

Even if Plaintiffs' complaint is construed to allege that Rossi's, rather than

ANPAC's, use of the sales form constituted an unfair and deceptive insurance practice,

the complaint nonetheless cannot reasonably be construed to assert a private right of

action for monetary damages under the Act. See NMSA 1978, § 59A-16-30 (1990)

(providing a private right of action for "[a]ny person covered by Chapter 59A, Article 16

NMSA 1978 who has suffered damages as a result of a violation of that article by an

insurer or agent").  Nowhere in Plaintiffs' *Verified Complaint for Declaratory Relief* do

Plaintiffs seek monetary damages, either individually or on behalf of the proposed class.

Indeed, in their prayer for relief, Plaintiffs simply seek certification of the class, a

declaratory judgment, "additional coercive, injunctive relief in the form of a

Supplemental Declaratory Judgment," attorneys' fees, and costs. [Doc. 1-1 at 19-21]

Construing the complaint broadly, but realistically, it is clear that the complaint merely

alleges a violation of the Act in support of Plaintiffs' request for declaratory relief

regarding contract reformation. Indeed, paragraph 38, which immediately follows the

foregoing excerpt from the complaint, provides as follows:

> 38.    The Plaintiffs, JAMES D. DOWNEY and JULIE A. DOWNEY,
> respectfully ask the Court to declare that the Defendant's,
> AMERICAN NATIONAL PROPERTY AND CASUALTY
> COMPANY [ANPAC], UM sales form was an invalid offer of equal
> UM limits as required by § 66-5-301©, and that such form was
> insufficient to serve as a written rejection of UM coverage limits
> equal to their liability limits, as required by NMAC § 13.12.3.9.

[Doc. 1-1 at 13]  In its prayer for relief on behalf of the proposed class, the complaint

seeks, *inter alia*, a declaratory judgment

> declaring that every New Mexico MFRA/UM policy or renewal policy
> issued by ANPAC in New Mexico on or after December 12, 1990, where
> such policy provided less than equal limits UM coverage, is now
> retroactively reformed to provide equal limits UM coverage as required
> under NMSA 1978, § 66-5-301, NMAC § 13.12.3.9, and the Supreme
> Court's holding in Jordan.

[Doc. 1-1 at 19]  Because a declaratory judgment with respect to contract reformation will

not redress the alleged injuries caused by Rossi, Rossi's *Motion to Dismiss Claims*

*Against Defendant Dennis Rossi* [Doc. 13] is hereby granted.

## III.   CONCLUSION

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that Plaintiffs' *Motion for Extension of Time to*

*File Reply to Response to Motion for Remand* [Doc. 23] is **DENIED** as moot;

**IT IS FURTHER ORDERED** that Plaintiffs' *Request for Leave to Reply to*

*Response to Motion to Remand* [Doc. 26] is **GRANTED**;

**IT IS FURTHER ORDERED** that *Plaintiffs' Motion to Remand and Memorandum in Support* [Doc. 15] is **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiffs' *Motion to Stay Briefing on Motions to Dismiss Pending Resolution of Motion to Remand* [Doc. 14] is **DENIED**;

**IT IS FURTHER ORDERED** that ANPAC's *Motion to Dismiss Plaintiffs' Claims Against Defendants American National Property and Casualty Company and American National General Insurance Company* [Doc. 12] is **DENIED**;

**IT IS FURTHER ORDERED** that Rossi's *Motion to Dismiss Claims Against Defendant Dennis Rossi* [Doc. 13] is **GRANTED**.

**SO ORDERED** this 31st day of March, 2012, in Albuquerque, New Mexico.

M. CHRISTINA ARMIJO
United States District Judge